Linda J. Clark
Joseph A. Murphy
Hiscock & Barclay, LLP
80 State Street
Albany, New York  12207-2543
Telephone: (518) 429-4241/4248
lclark@hblaw.com
jmurphy@hblaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BDRN, LLC, BDRN PHARMACY, LLC, and JOHN DOE,**<br><br>*Plaintiffs*,<br><br>vs.<br><br>**UNITEDHEALTHCARE OF NEW YORK, INC., UNITEDHEALTHCARE INSURANCE COMPANY OF NEW YORK, and OPTUMRX, INC.,**<br><br>*Defendants*. | **DECLARATION OF JOSEPH A. MURPHY**<br><br>Civil Action No. 15-cv-804 (NSR) |

**JOSEPH A. MURPHY** declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am an associate in the firm of Hiscock & Barclay, LLP, attorneys for Plaintiffs in the above-captioned action.  As such, I am fully familiar with the facts and circumstances in this matter.

### I.  AFFIRMATION OF GOOD FAITH

2. I provide this declaration in part to document my good faith efforts to notify the party against whom the temporary restraining order is sought of the time, date and place that the application will be made in a manner sufficient to permit the party an opportunity to appear in response to the application.

3. On February 5, 2015 I emailed Michael Bernstein, Esq., counsel to Defendants, and informed him that I had contacted this Court and scheduled an appearance to present this application on February 11, 2015 at 3pm. I also informed Mr. Bernstein that the papers on which the application would be based would be substantially the same as the papers that had been filed in New York state court prior to removal of this case and which had already been sent to defense counsel.

## II. PRELIMINARY STATEMENT

4. This is an action for declaratory and injunctive relief (originally brought in New York state court ("State Court Action")[1] and subsequently removed to this Court) to settle important questions concerning the meaning of statutory language in a New York consumer rights law and to enforce compliance with federal and state antitrust laws and other New York consumer protection laws.

5. The Anti-Mandatory Mail Order ("AMMO") law embodied in New York's Insurance Law grants health insurance members such as Plaintiff John Doe the right to obtain covered prescriptions at the network pharmacy of his choice, if that pharmacy agrees to certain applicable terms and conditions.

6. Here, Mr. Doe, who suffers from the blood disorder hemophilia, invoked that statutory right to obtain his clotting factor at a local retail pharmacy specializing in his condition – Plaintiff BDRN (collectively BDRN, LLC ("BDRN-NJ") and BDRN Pharmacy, LLC ("BDRN-NY")). However, United (collectively, Defendants UnitedHealthcare of New York, Inc. ("UHCNY") and UnitedHealthcare Insurance Company of New York ("UHCICNY")) thwarted that choice by imposing conditions that were in no way "applicable" to a local retail

---

[1] The parties of the State Court Action (Index Number 51334/2015, New York Supreme Court, Westchester County) are identical to those in this federal action.

HISCOCK & BARCLAY, LLP

pharmacy such as BDRN.  Instead, United steers all of these expensive "specialty" medications to its corporate affiliate, OptumRx, forcing Mr. Doe to obtain his medication through the mail from that out-of-state corporate entity.  Mr. Doe's next prescription is due to be filled on or around February 20, 2015.

7.     This violation of the AMMO statute endangers Mr. Doe's health and also violates state and federal antitrust laws.

8.     In further support of their application, Plaintiffs also submit the accompanying Memorandum of Law ("MOL") and the Affidavits of Plaintiff John Doe ("Doe Aff."), annexed hereto as **Exhibit C**, Nelson Escoto ("Escoto Aff."), annexed hereto as **Exhibit D**, and Selig Corman ("Corman Aff."), annexed hereto as **Exhibit E**.[2]

### III.  STATEMENT OF FACTS

**A.     BDRN, as a Local Retail Pharmacy, Provides Personal Service to Patients Such as Mr. Doe**

9.     BDRN, which stands for Bleeding Disorders Resource Network, specializes in bleeding disorders such as hemophilia, a disease that prevents clotting and leaves patients susceptible to spontaneous bleeds into their joints and other areas of the body.  BDRN's executives have decades of experience serving the hemophilia community and are members and officers of the Bleeding Disorders Association of the Southern Tier, the New York State Hemophilia Advocacy Coalition, The National Hemophilia Foundation and the Hemophilia Association of New Jersey, among others.  Ex. D, Escoto Aff. ¶¶ 5-6.

10.    Plaintiff John Doe was born with severe factor VIII deficiency (hemophilia A), and when a joint suddenly swells with blood because of an injury, at times he is unable to walk. If those bleeds are not treated as prescribed, they can become limb or life threatening.  Because

---

[2] The referenced affidavits contain the caption of the State Court Action.

of this condition, it is imperative that Mr. Doe have reliable access to his clotting factor medication. Ex. C, Doe Aff. ¶¶ 2-3.

11. When the health insurance through Mr. Doe's employer was switched over to United in 2013, he began using BDRN, which was very responsive to his medical needs and extremely knowledgeable about his condition. BDRN not only supplied Mr. Doe with his medication, it also supplied ancillary supplies such as syringes, alcohol pads, swabs, knee braces, bandages and ice packs. BDRN also supplied coolers to store his medication in when traveling in order to maintain its efficacy. BDRN even supplied Mr. Doe with a small refrigerator to store the medicine. BDRN also delivered the medicine and ancillary supplies to Mr. Doe's home via personal delivery with its own staff at the time and date specified by Mr. Doe or his wife. Ex. C, Doe Aff. ¶¶ 4-7.

**B.   Mandatory Mail Order by United and Others Threatens the Patient-Pharmacy Bond**

12. These intimate partnerships between patients and their local retail pharmacists have been put in jeopardy, however, as large health plans have mandated that many patients obtain so-called "specialty" medications through the mail. Compl. ¶ 27.

13. This mandatory mail order scheme has several inherent disadvantages for patients, including communications by email and phone with random staffers in place of face-to-face counseling with a pharmacist, and shipping of medications by UPS or Federal Express, with attendant delays and logistical challenges. The structural and logistical problems associated with mandatory mail order is more than a mere inconvenience to the patients who rely on these "specialty" medications, who may be left to the uncertainty of a UPS delivery truck. To those with serious conditions, delay can be fatal. Compl. ¶¶ 28-29.

HISCOCK & BARCLAY, LLP

14. Mandatory mail order also often results in a shocking loss of privacy. Patients forced to use mail order pharmacy are faced with the risk that their package will be left with a neighbor, family member, coworker, or even a total stranger, with critical health information at risk of disclosure against the patient's wishes. Compl. ¶ 30.

15. Mandatory mail order also puts at risk the efficacy of the drugs themselves. Many "specialty" medications are temperature sensitive and will become useless or even toxic if left out in the heat or cold, which is a widely-reported occurrence with drug shipments sent by UPS or Federal Express. The timing of drug deliveries is also a critical component of the treatment of many disease states, which can be compromised by late deliveries resulting from mandatory mail order. Ex. E, Corman Aff. ¶¶ 13-14.

16. Not coincidentally, the drugs of choice that the plans tab for mandatory mail order happen to be the most expensive drugs, and the mail order pharmacies to which the plans steered these big-ticket medications were corporate affiliates of the plans themselves, strongly suggesting that mandatory mail order is nothing more than a means to increase profits at the expense of patient health. That is the case here, where United has steered many expensive, high-profit drugs to OptumRx, which is a wholly-owned subsidiary of United's corporate parent. Compl. ¶¶ 33-34.

## C. The New York Legislature and Chief Executive Curb Mandatory Mail Order

17. Because of public outrage resulting from the imposition of mandatory mail order, New York's elected officials responded by enacting reform legislation. In 2011, the New York legislature and Governor Cuomo enacted an amendment to the New York Insurance Law to prohibit mandatory mail order of drugs. Ex. E, Corman Aff. ¶ 19. That amendment, commonly

HISCOCK & BARCLAY, LLP

known as the "Anti Mandatory Mail Order" or "AMMO" law, currently provides in relevant part that:

> Any policy that provides coverage for prescription drugs shall permit each insured to fill any covered prescription that may be obtained at a network participating mail order or other non-retail pharmacy, at the insured's option, at a network participating non-mail order retail pharmacy provided that the network participating non-mail order retail pharmacy agrees in advance, through a contractual network agreement, to the same reimbursement amount, as well as the same **applicable terms and conditions**, that the insurer has established for the network participating mail order or other non-retail pharmacy.

Ins. Law § 3216(i)(28) (emphasis added).

18. In layman's terms, the AMMO law ensures that patients may fill any covered drug at the local network retail pharmacy of their choice, as long as that pharmacy has agreed to the same reimbursement amount and applicable terms and conditions as the network's preferred mail order pharmacy.

19. In June 2011, the New York State Assembly overwhelmingly passed the original version of the AMMO bill by a vote of 143 to two, and the New York State Senate passed it by a similarly overwhelming vote of 60 to two. An excerpt of the AMMO legislation's Bill Jacket and the Governor's signing memo are annexed hereto as **Exhibit A**.

20. The initial bill passed by both houses did not contain the phrase "applicable terms and conditions." Governor Cuomo on December 12, 2011 signed it into law in December 2011 along with a Memo stating that he was doing so with the understanding that the Legislature would further amend the statute to add the phrase "applicable terms and conditions." The Governor's Memo further stated that he supported the objectives of the bill, which he described as seeking "to improve consumer convenience by expanding the options by which consumers can fill their drug prescriptions." By further amendment the Legislature subsequently added the

HISCOCK & BARCLAY, LLP

"applicable terms and conditions" language and made several other immaterial changes but left intact the substantive expansion of patients' rights. Ex. A.

**D.     United and Other Health Plans Subvert New York's AMMO Reform Statute**

21.     Despite the Legislature's and Governor's clear statement of public policy in favor of patient choice, United has subverted the clear purpose of the statute by unreasonably interpreting the law to keep local retail pharmacies out of its "specialty" drug network. Specifically, United has focused on the provision of the statute requiring that the retail pharmacy agree to "the same applicable terms and conditions" that the plan has established for its preferred mail order pharmacy.

22.     United has required local retail pharmacies, including BDRN, to adhere to terms and conditions that are appropriate only for larger, national mail order pharmacies, thus essentially reading the word "applicable" out of the statute.

**E.     United Imposes Inapplicable Terms and Conditions on BDRN**

23.     BDRN applied in early 2014 to join United's specialty pharmacy network on behalf of United member Plaintiff John Doe. BDRN was instructed by United to return a completed National Provider Inquiry Questionnaire ("Questionnaire"). Ex. D, Escoto Aff.¶ 10. A copy of the Questionnaire is annexed hereto as **Exhibit B**.[3]

24.     The Questionnaire requires applicants, even local retail pharmacies like Plaintiffs, to, among other things, provide services with geographical coverage in the majority of the United States. Ex. B. Such a requirement obviously is ludicrous for local retail pharmacies such as Plaintiffs, whose customer base is located primarily in the New York-New Jersey metro area, and serves no purpose other than as an impermissible barrier to entry.

---

[3] Plaintiffs also move to file Exhibit B under seal. *See* MOL Argument § E.

25. The Questionnaire also imposes the condition that applicants obtain accreditation by the Utilization Review Accreditation Commission, commonly known as "URAC." Ex. B. There is no provision under New York law for the requirement that a pharmacy be accredited by URAC, or any other accrediting body. Ex. E, Corman Aff. ¶ 6. Moreover, upon information and belief, URAC is a creation of the pharmacy benefit manager ("PBM") industry and serves primarily as an anti-competitive barrier to entry for retail pharmacies that would compete with large PBMs and their affiliated mail-order pharmacies. *See* Ex. E, Corman Aff. ¶ 6; Ex. D, Escoto Aff. ¶ 13.

26. For example, URAC's accreditation fees for specialty pharmacies are approximately $30,000 for a single pharmacy location, and URAC takes months to make a determination after the application has been submitted. Aside from the inappropriate time and expense imposed by URAC, such accreditation is simply not necessary. For decades independent pharmacies in New York have been dispensing medications that the PBM industry is now deeming "specialty drugs." Without obtaining URAC accreditation, these independent pharmacies have provided excellent service to their clients. Ex. E, Corman Aff. ¶¶ 7-8; Ex. D, Escoto Aff. ¶¶ 14-15.

27. There is simply no clinical necessity for independent pharmacies to obtain URAC accreditation. To the contrary, the imposition of conditions such as URAC accreditation and other conditions that are inapplicable to retail pharmacies have decreased the number of pharmacies in PBM specialty pharmacy networks with the effect that patients have decreased access to the pharmacy of their choice. Ex. E, Corman Aff. ¶¶ 9-10.

28. On January 15, 2015, I spoke by phone with United's Associate General Counsel Laura Wolfe, who informed me that BDRN would be ineligible for participation in United's

HISCOCK & BARCLAY, LLP

specialty pharmacy network if it did not have URAC accreditation. Ms. Wolfe's predecessor at United had told me the same thing after BDRN had sought to join United's specialty network in 2014.

### F. United and its Mandatory Mail Order Partner OptumRx Fail John Doe

29. Because United improperly denied BDRN membership in United's specialty pharmacy network, Plaintiff John Doe was forced to obtain his life-saving medication through United's corporate affiliate and mandatory mail order partner OptumRx. *See* Ex. C, Doe Aff. ¶ 8.

30. That has presented several severe difficulties for Mr. Doe and his family. Like many other patients with chronic diseases, John Doe is a working parent with a small child, and it is a significant burden for him to arrange for himself or his full-time student wife to wait at home for UPS to drop off the package that requires a signature. Moreover, the package cannot be left at his door because he lives in a small walk-up apartment, the common area is not secure and the medication could be impaired by temperature fluctuations. Because of privacy issues and the size of the package (sometimes two huge boxes that need to be refrigerated), John Doe understandably prefers not to have the package sent to his work address. Ex. C, Doe Aff. ¶¶ 9-12.

31. BDRN's drivers also pick up medical waste from their patients, a service that, upon information and belief, United's mail order pharmacy does not provide. Other mail-order pharmacies have sent Mr. Doe "mail-away sharps" that have huge bio-waste signs all over them. He has to personally take them to the post office to have them shipped for destruction, which creates another privacy risk. Ex. C, Doe Aff. ¶ 13.

HISCOCK & BARCLAY, LLP

32. It is not always easy for hemophiliacs to predict how often they will need to refill their medications, because their use of clotting factor fluctuates from month to month and week to week depending on the severity of their condition. When Mr. Doe called OptumRx and said he needed more clotting factor as soon as possible, OptumRx said they would verify his prescription and call him back within an hour. In actuality, they did not get back to him for another two or three days. Ex. C, Doe Aff. ¶ 14.

33. Another time, after Mr. Doe returned BDRN's loaner refrigerator, he asked OptumRx if it would provide him with one. OptumRx did not, and instead suggested that he store the clotting factor on his back porch, since it was winter time. Clearly that was not a reasonable suggestion because the factor is temperature sensitive and very expensive. Ex. C, Doe Aff. ¶ 15.

34. In August 2014 when Mr. Doe placed an order with OptumRx, he was not going to be home to receive the medication, so he asked OptumRx to arrange to have it delivered to his mother's home in Pelham, New York at a designated time. UPS did not deliver the package on time, and when his mother finally had to leave, she saw the UPS driver leaving and the package of medication left outside without a signature. Ex. C, Doe Aff. ¶ 16.

35. More recently OptumRx delayed another shipment due on December 23, 2014 at 10am. His wife stayed home to wait for the delivery, and when it did not arrive by 11am, Mr. Doe called OptumRx and was informed that OptumRx would have to get back to him. Several more hours went by before OptumRx called and said there was a delay with UPS and he would not receive the shipment until the following day, Christmas Eve. Ex. C, Doe Aff. ¶ 17.

36. That was a concern because Mr. Doe was down to a single dose, and he typically takes one dose per day over three consecutive days whenever he has a major bleed. He also

HISCOCK & BARCLAY, LLP

takes a dose as a precaution if he knows he will be a long way from home without access to his medication or if he plans to have a particularly active day, such as when he plays with his child at the park  With the delay in the shipment and being down to one dose, Mr. Does was forced to preserve the last dose he had on hand.  Ex. C, Doe Aff. ¶ 17.

37.     The next day, December 24th, the shipment had not arrived by noon, and OptumRx told Mr. Doe to call UPS and handle it himself.  The shipment finally arrived around 2pm, but by that time Mr. Doe had to change plans he had made in order to wait for the delivery.  Ex. C, Doe Aff. ¶ 18.

38.     Last week Mr. Doe informed me that his next prescription for his hemophilia medicine is due to be filled on or about <u>February 20, 2015</u>.

39.     For all of these reasons, Mr. Doe's choice is to use BDRN as the pharmacy for his hemophilia medications and supplies.  Ex. C, Doe Aff. ¶20.

### G.    Facts Relevant to Antitrust Allegations

40.     The relevant product market here is the market for the dispensing of the drugs contained in the formulary for United's specialty pharmacy network.  Given state licensing requirements for retail pharmacies, the relevant geographical and demographic market for these products is the state of New York.  Compl. ¶¶ 85-86.

41.     Upon information and belief, many of the specialty drugs on United's formulary for its specialty pharmacy network are manufactured in states other than New York and/or in foreign nations and thus constitute a continuous and uninterrupted flow of interstate and foreign trade and commerce.  The activities of United as described in the Complaint have been within the flow of, and have substantially affected, interstate trade and commerce.  Upon information

HISCOCK & BARCLAY, LLP

and belief, United maintains a sufficient market share to warrant antitrust scrutiny. Compl. ¶¶ 87-89.

42. Upon information and belief, United will only cover the costs of medications on its specialty drug formulary if a United member obtains such drugs from a pharmacy approved by United. Upon information and belief, United has not allowed any pharmacy other than its affiliate OptumRx entry into United's specialty pharmacy network. Compl. ¶ 90.

43. This unlawful combination and conspiracy may be renewed unless the relief prayed for herein is granted.

44. For the reasons set forth herein, the Court should issue a Temporary Restraining Order and Preliminary Injunction ordering Defendants to allow BDRN to participate in United's Specialty Pharmacy Network for Pharmacy Benefit; and award Plaintiffs such other and further relief as this Court may deem proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2015

                                        _____/s *Joseph A. Murphy*_____
                                                      Joseph A. Murphy

HISCOCK & BARCLAY, LLP