STATE OF NEW YORK
SUPREME COURT            COUNTY OF WESTCHESTER

---

**BDRN, LLC, BDRN PHARMACY, LLC, and JOHN DOE,**

*Plaintiffs,*

-*against*-

**UNITEDHEALTHCARE OF NEW YORK, INC., UNITEDHEALTHCARE INSURANCE COMPANY OF NEW YORK, and OPTUMRX, INC.**

*Defendants.*

**AFFIDAVIT OF SELIG CORMAN, RPh**

Index No.

---

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF WESTCHESTER   )

SELIG CORMAN, RPh, being duly sworn, deposes and says:

1. I have been a duly licensed pharmacist in the state of New York for more than 56 years and owned and operated my own pharmacy in New York for more than 30 years.

2. After retiring from my role as owner and operator of my pharmacy, I have been employed in a pharmacy policy role in a non-profit pharmacy association.

3. Through my decades of experience, I have stayed informed regarding various facets of pharmacy practice, law and policy.

4. I am informed that Defendants UnitedHealthcare of New York, Inc. ("UHCNY") and UnitedHealthcare Insurance Company of New York ("UHCICNY" and, together with UHCNY, "United") are requiring that applicants to United's Specialty Pharmacy Network for Pharmacy Benefit obtain accreditation by the Utilization Review Accreditation Commission, commonly known as "URAC."

8768515.1

5. Based on my long experience in the pharmacy field, I am familiar with the background and role of URAC.

6. There is no provision under New York law for the requirement that a pharmacy be accredited by URAC, or any other accrediting body. Moreover, URAC is a creation of the pharmacy benefit manager ("PBM") industry and serves primarily as an anti-competitive barrier to entry for retail pharmacies that would compete with large PBMs and their affiliated mail-order pharmacies.

7. URAC's accreditation fees for specialty pharmacies are very expensive and time consuming. I am familiar with reports from independent pharmacies that the URAC accreditation fee was approximately $30,000 for a single pharmacy location and that URAC takes months to make a determination after the application has been submitted.

8. Aside from the inappropriate time and expense imposed by URAC, such accreditation is simply not necessary. For decades independent pharmacies in New York have been dispensing medications that the PBM industry is now deeming "specialty drugs." Without obtaining URAC accreditation, these independent pharmacies have provided excellent service to their clients.

9. Based on my experience, there is no clinical necessity for independent pharmacies to obtain URAC accreditation.

10. To the contrary, the imposition of conditions such as URAC accreditation and other conditions that are inapplicable to retail pharmacies have decreased the number of pharmacies in PBM specialty pharmacy networks with the effect that patients have decreased access to the pharmacy of their choice.

11. Patient choice is an important part of a patient's clinical experience. Retail pharmacies often deliver medications to the patient's home or other location at a time specifically requested by the patient, or will hold the medications at the pharmacy if that is the patient's preference.

12. Mandatory mail order, in contrast, is typically sent by UPS or Federal Express, with attendant

delays and logistical challenges regarding delivery timing, making a form of delivery that is very difficult for some patients.

13. Mandatory mail order also puts at risk the efficacy of the drugs themselves. Many "specialty" medications are temperature sensitive and will become useless or even toxic if left out in the heat or cold.

14. The timing of drug deliveries is also a critical component of the treatment of many acute disease states, which can be compromised by late deliveries resulting from mandatory mail order. For example, some drugs typically are prescribed to be taken together in order to achieve maximum effectiveness, so that if one drug arrives late, the patient's entire treatment regimen is at risk. Some oncology chemotherapy medications induce severe and intractable nausea and vomiting or autoimmune reactions and need "pre-medications" to be administered 30 to 60 minutes before the actual chemotherapeutic agents. Additionally, many chemotherapeutic agents cause severe anemias that could be life threatening. A physician might not know that a patient is anemic until reviewing subsequent blood work after the initial treatment.

15. These types of problems are minimized when patients can obtain their medications at the local pharmacy of their choice. Patients are able to bring any questions they have to a live person, in person, and have a conversation about drug directions, interactions, alternatives, and any other topic.

16. Mandatory mail order, on the other hand, forces patients to interact with a complex web of remote technology, including voicemail systems and online portals that often bewilder the many elderly patients trying to obtain critical information about their life-saving medications.

17. Patients who need high-end, life-saving drugs are because of their medical conditions the people most in need of personal service that can best be provided by their local, trusted retail pharmacist.

18. Because of public outrage resulting from the imposition of mandatory mail order, New York's elected officials responded by enacting reform legislation.

19. In 2011, the New York legislature and Governor Cuomo enacted an amendment to the New

York Insurance Law to prohibit mandatory mail order of drugs. That amendment is commonly known as the "Anti Mandatory Mail Order" or "AMMO" law.

20. I took a great interest in the enactment of the AMMO law, which clearly was designed to be a pro-consumer choice law.

21. However, some health plans and PBMs have subverted the clear purpose of the statute by unreasonably interpreting the law to keep local retail pharmacies out of their networks.

22. Specifically, they have focused on the provision of the statute requiring that the retail pharmacy agree to "the same applicable terms and conditions" that the plan has established for its preferred mail order pharmacy.

23. I am aware that some health plans and PBMs routinely require local retail pharmacies to adhere to terms and conditions that are appropriate only for larger, national mail order pharmacies, thus essentially reading the word "applicable" out of the statute.

24. These conditions exceed the requirements set forth by statute in New York's AMMO law and bear little or no relevance to terms applicable to a retail pharmacy platform where the prescriber interacts directly with patients and is governed by New York laws requiring patient counseling, etc.

25. As explained above, URAC accreditation is one such condition that is not applicable to a retail pharmacy. A requirement that a pharmacy provide services with geographical coverage in the majority of the United States is another condition that would not be applicable to a local retail pharmacy.

26. For these reasons, I support plaintiffs' request for a declaratory judgment that the phrase "applicable terms and conditions" in Section 3216(i)(28) of the New York Insurance Law (i) means, in general, only those terms and conditions that are reasonably applicable to the network participating non-mail order retail pharmacy chosen by a health plan's member, and (ii) may not be construed to require URAC or other accreditation or certification not required by New York law, services with geographical coverage in the

8768515.1

majority of the United States, or other term or condition not reasonably applicable to the network participating non-mail order retail pharmacy chosen by the health plan's member

 

_____
SELIG CORMAN, RPh

Subscribed and sworn to before me

this **31st** day of **December**, 201**4**

_____
Notary Public

JILL VANSLUYTERS
NOTARY PUBLIC, State of New York
No. 4991197
Qualified in Rensselaer County
Commission Expires ~~Jan 27, 19~~ 05/14/18