UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BDRN, LLC, BDRN PHARMACY, LLC, and JOHN DOE,

<em>Plaintiffs,</em>

-against-

**AMENDED COMPLAINT**

Civil Action No. 15-cv-804 (NSR)

Hon. Nelson S. Román, U.S.D.J.

UNITEDHEALTHCARE OF NEW YORK, INC.,
UNITEDHEALTHCARE INSURANCE COMPANY OF
NEW YORK, and OPTUMRX, INC.

<em>Defendants.</em>

Plaintiffs, by their attorneys, Hiscock & Barclay, LLP, as and for their Complaint against the above named Defendants, allege as follows:

<u>INTRODUCTION</u>

1.      This is an action for declaratory and injunctive relief pursuant to New York Civil Practice Law and Rules ("CPLR") § 3001 to settle important questions concerning the meaning of statutory language in a consumer rights law affecting pharmacy patients all across New York and to enforce compliance with federal and state antitrust laws and New York consumer protection laws.

2.      Plaintiffs, two licensed New York pharmacies and one individual, file this lawsuit in order to obtain declarations that:

    a.   the phrase "applicable terms and conditions" in Section 3216(i)(28) of the New York Insurance Law (i) means only those terms and conditions that are reasonably applicable to the network participating non-mail order retail pharmacy chosen by a health plan's member, and (ii) may not be construed to require URAC or other accreditation or certification not required by New York law, services with geographical coverage in the majority of the United States, or other term or condition not reasonably applicable to the network participating non-mail order retail pharmacy chosen by a health plan's member;

b.  having agreed in advance to the same reimbursement amount, as well as the same applicable terms and conditions, that United has established for its network participating mail order or other non-retail pharmacy, Plaintiff pharmacies have fulfilled all of the conditions that United may impose under Section 3216(i)(28) of the New York Insurance Law as requirements for becoming participating providers in United's specialty pharmacy network.

c.  Defendants have combined and conspired to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act;

d.  Defendants have combined and conspired to restrain trade and commerce in New York in violation of Sections 349(1) of New York's General Business Law; and

e.  Defendants are liable under 15 U.S.C. § 1125(a)(1)(B), the Lanham Act.

3.  Plaintiffs also seek injunctive relief ordering Defendants to allow BDRN to participate in Defendants' Specialty Pharmacy Network for Pharmacy Benefit and enjoining and restraining the Defendants from other conduct complained of herein.

## JURISDICTION AND VENUE

4.  This action was removed to this District Court from New York State Supreme Court, Westchester County by Defendants on February 3, 2015.

5.  In the Notice of Removal, Defendants asserted that this Court has original jurisdiction pursuant to 29 U.S.C. §§ 1332(e)(1) and 28 U.S.C. §§ 1331 based on federal question jurisdiction.

6.  This Court has further federal question subject matter jurisdiction over the subject matter of this litigation for violations of the Lanham Act pursuant to 15 U.S.C. § 1121.

- 2 -

7.     This Court has supplemental subject matter jurisdiction under 28 U.S.C. §1367 over BDRN's claims under New York State law.

8.     This Court has personal jurisdiction over each of the Defendants because, among other things, each regularly does business in the state of New York and in this judicial district, and because Defendants have established minimum contacts with the forum and the exercise of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice. Each of the Defendants have voluntarily conducted business and solicited customers in the state of New York, including in this judicial district. Each of the Defendants has committed and continues to commit acts in violation of the claims asserted herein in the state of New York and in this judicial district.

9.     Venue is proper in this judicial district under 18 U.S.C. §1965.  Each of the Defendants resides in, can be found in, has one or more agents in, and/or transacts or has transacted business in this district and division.

## THE PARTIES

### The Plaintiffs

10.     Plaintiff BDRN, LLC ("BDRN-NJ"), located at 1 South Corporate Drive, Suite D, Second Floor, Riverdale, New Jersey 07457, is a pharmacy duly licensed by the state of and New Jersey and duly registered with the state of New York.

11.     It serves patients, including some United Healthcare members, throughout the New York-New Jersey metropolitan area, including Westchester County.

12.     Plaintiff BDRN Pharmacy, LLC ("BDRN-NY" and, together with BDRN-NJ, "BDRN"), located at 108 Orange Avenue, Walden, New York 12586, is a pharmacy duly licensed by the state of New York.

HISCOCK & BARCLAY, LLP

13.     It serves patients, including many United Healthcare members, throughout the New York-New Jersey metropolitan area, including Westchester County.

14.     Plaintiff John Doe, not his real name, is an individual United Healthcare member residing in Westchester County, New York.

15.     He is identified herein by the moniker John Doe in order to protect his privacy, and Plaintiffs have disclosed his name to Defendants.

**The Defendants**

16.     Upon information and belief, and at all times hereinafter mentioned, Defendant UnitedHealthcare of New York, Inc. ("UHCNY") was and is a domestic business corporation with its principal place of business located at 77 Water Street, 14th/15th Floor, New York, New York, 10005.

17.     Upon information and belief, and at all times hereinafter mentioned, Defendant UnitedHealthcare Insurance Company of New York ("UHCICNY") was and is a domestic business corporation with its principal place of business located at 2950 Express Drive South, Suite 240, Islandia, New York 11749.

18.     Upon information and belief, both UHCNY and UHCICNY (together, "United") are wholly-owned subsidiaries of UnitedHealth Group Incorporated, a Minnesota Corporation.

19.     Upon information and belief, and at all times hereinafter mentioned, Defendant OptumRx, Inc. ("OptumRx") was and is a business corporation domiciled in California with its principal place of business located at 2300 Main Street, MS CA134-0501, Irvine, California 92614.

20.     Upon information and belief, OptumRx is a wholly owned subsidiary of UnitedHealth Group Incorporated and thus a corporate  affiliate of both UHCNY and UHCICNY.

- 4 -

HISCOCK & BARCLAY, LLP

21.     OptumRx is named here as a presumably necessary party.

**FACTUAL ALLEGATIONS**

**A.      Personal Service Traditionally Provided by Local Retail Pharmacies Such as BDRN**

22.     BDRN, which stands for Bleeding Disorders Resource Network, specializes in bleeding disorders such as hemophilia, which prevents clotting and leaves patients susceptible to spontaneous bleeds into their joints and other areas of the body.

23.     BDRN's executives have decades of experience serving the hemophilia community and are members and officers of the Bleeding Disorders Association of the Southern Tier, the New York State Hemophilia Advocacy Coalition, The National Hemophilia Foundation and the Hemophilia Association of New Jersey, among others.

24.     Plaintiff John Doe was born with severe factor VIII deficiency (hemophilia A), and when a joint suddenly swells with blood because of an injury, at times he is unable to walk.

25.     If those bleeds are not treated as prescribed, they can become limb or life threatening.

26.     Because of this condition, it is imperative that Mr. Doe have reliable access to his clotting factor medication.

27.     When the health insurance through Mr. Doe's employer was switched over to United in 2013, he began using BDRN, which was very responsive to his medical needs and extremely knowledgeable about his condition.

28.     BDRN not only supplied Mr. Doe with his medication, it also supplied ancillary supplies such as syringes, alcohol pads, swabs, knee braces, bandages and ice packs.  BDRN also supplied coolers to store his medication in when traveling in order to maintain its efficacy.

29.     BDRN even supplied Mr. Doe with a small refrigerator to store the medicine.

HISCOCK & BARCLAY, LLP

30.     BDRN also delivered the medicine and ancillary supplies to Mr. Doe's home via personal delivery with its own staff at the time and date specified by Mr. Doe or his wife.

**B.      The Rise of Mandatory Mail Order Threatens the Patient-Pharmacy Bond**

31.     These intimate partnerships between patients and their local retail pharmacists have been put in jeopardy, however, as large health plans have mandated that many patients obtain so-called "specialty" medications through the mail.

32.     This mandatory mail order scheme has several inherent disadvantages for patients, including communications by email and phone with random staffers in place of face-to-face counseling with a pharmacist, and shipping of medications by UPS or Federal Express, with attendant delays and logistical challenges.

33.     The structural and logistical problems associated with mandatory mail order is more than a mere inconvenience to the patients who rely on these "specialty" medications, who may be left to the uncertainty of a UPS delivery truck.  To those with serious conditions, delay can be fatal.

34.     Mandatory mail order also often results in a shocking loss of privacy.  Patients forced to use mail order pharmacy are faced with the risk that their package will be left with a neighbor, family member, coworker, or even a total stranger, with critical health information at risk of disclosure against the patient's wishes.

35.     Mandatory mail order also puts at risk the efficacy of the drugs themselves.  Many "specialty" medications are temperature sensitive and will become useless or even toxic if left out in the heat or cold, which is a widely-reported occurrence with drug shipments sent by UPS or Federal Express.

36.     The timing of drug deliveries is also a critical component of the treatment of many disease states, which can be compromised by late deliveries resulting from mandatory mail order.

- 6 -

37.     Not coincidentally, the drugs of choice that the plans tab for mandatory mail order happen to be the most expensive drugs, and the mail order pharmacies to which the plans steered these big-ticket medications were corporate affiliates of the plans themselves, strongly suggesting that mandatory mail order is nothing more than a means to increase profits at the expense of patient health.

38.     That is the case here, where United has steered many expensive, high-profit drugs to OptumRx, which, upon information and belief, is a wholly owned subsidiary of United's corporate parent.

**C.     The New York Legislature and Chief Executive Curb Mandatory Mail Order**

39.     Because of public outrage resulting from the imposition of mandatory mail order, New York's elected officials responded by enacting reform legislation.

40.     In 2011, the New York legislature and Governor Cuomo enacted an amendment to the New York Insurance Law to prohibit mandatory mail order of drugs.  That amendment, commonly known as the "Anti Mandatory Mail Order" or "AMMO" law, currently provides in relevant part that:

> Any policy that provides coverage for prescription drugs shall permit each insured to fill any covered prescription that may be obtained at a network participating mail order or other non-retail pharmacy, at the insured's option, at a network participating non-mail order retail pharmacy provided that the network participating non-mail order retail pharmacy agrees in advance, through a contractual network agreement, to the same reimbursement amount, as well as the same **applicable terms and conditions**, that the insurer has established for the network participating mail order or other non-retail pharmacy.

Ins. Law §§ 3216(i)(28);  3221(l)(18) (emphasis added).

41.     In layman's terms, the AMMO law ensures that patients may fill any covered drug at the local network retail pharmacy of their choice, as long as that pharmacy has agreed to the same reimbursement amount and applicable terms and conditions as the network's preferred mail order pharmacy.[1]

42.     The legislative history of the AMMO law makes crystal clear that the amendment was

---

[1] AMMO does not apply to public insurance programs, such as Medicaid, nor to insurance coverage that is part of a negotiated collective bargaining agreement.  The New York Social Services law contains a similar pro-consumer choice provision governing Medicaid drugs at Section 364-j(4)(u).

HISCOCK & BARCLAY, LLP

designed to be a pro-consumer choice law.   The bill's Memo stated unequivocally that the purpose of AMMO was to "[p]rohibit[] health insurance policies from mandating their insured to purchase prescribed drugs from a mail order pharmacy."

43.   The Justification section of the AMMO bill explained in even greater detail that consumer choice was the driving purpose of the amendment.   It stated in full:

> This legislation will provide freedom of choice to consumers who have coverage for prescribed drugs as part of their health insurance. When a policy mandates purchase from a specific mail order pharmacy the consumer is forced to purchase an interim supply of the prescribed drug from his or her neighborhood pharmacist who is familiar with his or her medical history. The risk to the consumer in this situation is obvious.
>
> Furthermore, the neighborhood pharmacy in these situations is forced to bear the burden of educating the patient as to the use and potential effects of the prescribed drug. The inability of the consumer to purchase the full prescription from the neighborhood pharmacy imposes this burden inequitably, thereby providing the mail order house with an economic advantage that the local provider cannot over come.
>
> Finally, many consumers, especially senior citizens, rely on their local pharmacist for the service that they provide with respect to monitoring the regimen of drugs that they take. A mandate of purchase by mail denies them of this important service and confidence.

44.   In June 2011, the New York State Assembly overwhelmingly passed the original version of the AMMO bill by a vote of 143 to two, and the New York State Senate passed it by a similarly overwhelming vote of 60 to two.

45.   The initial bill passed by both houses did not contain the phrase "applicable terms and conditions."   Governor Cuomo on December 12, 2011 signed it into law along with a Memo stating that he was doing so with the understanding that the Legislature would further amend the statute to add the phrase "applicable terms and conditions."

46.   The Governor's Memo further stated that he supported the objectives of the bill, which he described as seeking "to improve consumer convenience by expanding the options by which consumers can

HISCOCK & BARCLAY, LLP

fill their drug prescriptions."

47.     By further amendment the Legislature subsequently added the "applicable terms and conditions" language and made several other immaterial changes but left intact the substantive expansion of patients' rights.

**D.      United and Other Health Plans Subvert New York's AMMO Reform Statute**

48.     Despite the Legislature's and Governor's clear statement of public policy in favor of patient choice, health plans such as United have subverted the clear purpose of the statute by unreasonably interpreting the law to keep local retail pharmacies out of their networks.

49.     Specifically, the plans, including United, have focused on the provision of the statute requiring that the retail pharmacy agree to "the same applicable terms and conditions" that the plan has established for its preferred mail order pharmacy.

50.     United and other health plans routinely require local retail pharmacies to adhere to terms and conditions that are appropriate only for larger, national mail order pharmacies, thus essentially reading the word "applicable" out of the statute.

51.     Even when local pharmacies bend over backwards to accommodate United's improper terms and conditions, they are merely strung along before being ultimately denied.

**E.      United Rejects BDRN's Application, Citing Inapplicable Terms and Conditions**

52.     BDRN applied in early 2014 to join United's specialty pharmacy network on behalf of United member Plaintiff John Doe and was instructed by United to return a completed National Provider Inquiry Questionnaire ("Questionnaire").

53.     The Questionnaire requires applicants, even local retail pharmacies like BDRN, to, among other things, provide services with geographical coverage in the majority of the United States.

54.    Such a requirement obviously is ludicrous for local retail pharmacies such as BDRN, whose customer base is located primarily in the New York-New Jersey metro area, and serves no purpose other than as an impermissible barrier to entry.

55.    The Questionnaire also imposes the condition that applicants obtain accreditation by the Utilization Review Accreditation Commission, commonly known as "URAC."

56.    There is no provision under New York law for the requirement that a pharmacy be accredited by URAC, or any other accrediting body.

57.    Moreover, upon information and belief, URAC is a creation of the pharmacy benefit manager ("PBM") industry and serves primarily as an anti-competitive barrier to entry for retail pharmacies that would compete with large PBMs and their affiliated mail-order pharmacies.

58.    For example, URAC's accreditation fees for specialty pharmacies are approximately $30,000 for a single pharmacy location, and URAC takes months to make a determination after the application has been submitted.

59.    Aside from the inappropriate time and expense imposed by URAC, such accreditation is simply not necessary, as for decades independent pharmacies in New York, without obtaining URAC accreditation, have provided excellent service to their clients when dispensing medications that the PBM industry is now deeming "specialty drugs."

60.    There is simply no clinical necessity for independent pharmacies to obtain URAC accreditation.

61.    To the contrary, the imposition of conditions such as URAC accreditation and other conditions that are inapplicable to retail pharmacies have decreased the number of pharmacies in PBM specialty pharmacy networks with the effect that patients have decreased access to the pharmacy of their

HISCOCK & BARCLAY, LLP

choice.

62.     United has informed BDRN that it would be ineligible for participation in United's specialty pharmacy network if it did not have URAC accreditation.

63.     Because BDRN has been improperly denied membership in United's specialty pharmacy network, patients, including John Doe, now have no choice but to obtain their medications by mail order from United's corporate affiliate, OptumRx.

**F.      United and its Mandatory Mail Order Partner OptumRx Fail John Doe**

64.     Because United improperly denied BDRN membership in United's specialty pharmacy network, Plaintiff John Doe was forced to obtain his life-saving medication through United's corporate affiliate and mandatory mail order partner OptumRx.[2]

65.     That has presented several severe difficulties for Mr. Doe and his family.

66.     Like many other patients with chronic diseases, John Doe is a working parent with a small child, and it is a significant burden for him to arrange for himself or his full-time student wife to wait at home for UPS to drop off the package that requires a signature.

67.     Moreover, the package cannot be left at his door because he lives in a small walk-up apartment, the common area is not secure and the medication could be impaired by temperature fluctuations.

68.     Because of privacy issues and the size of the package (sometimes two huge boxes that need to be refrigerated), John Doe understandably prefers not to have the package sent to his work address.

69.     BDRN's drivers also pick up medical waste from their patients, a service that, upon

_____

[2] Upon information and belief, United attempted to evade its statutory obligations by telling Mr. Doe that he could obtain his medications from three Hemophilia Treatment Centers, none of which is located nearby, or from an entity called Bioscrip, located in Lake Success, New York, with which Mr. Doe had no prior relationship.  Using any of these other entities would have required Mr. Doe to obtain a new prescription from his doctor and to complete additional paperwork.

HISCOCK & BARCLAY, LLP

information and belief, United's mail order pharmacy does not provide.

70.     Other mail-order pharmacies have sent Mr. Doe "mail-away sharps" that have huge bio-waste signs all over them.  He has to personally take them to the post office to have them shipped for destruction, which creates another privacy risk.

71.     Mr. Doe also finds United and OptumRx unreliable and difficult to deal with on the phone.

72.     It is not always easy for hemophiliacs to predict how often they will need to refill their medications, because their use of clotting factor fluctuates from month to month and week to week depending on the severity of their condition.

73.     When Mr. Doe called OptumRx and said he needed more clotting factor as soon as possible, OptumRx said they would verify his prescription and call him back within an hour.  In actuality, they did not get back to him for another two or three days.

74.     When Mr. Doe placed an order with OptumRx, he was not going to be home to receive the medication, so he asked OptumRx to arrange to have it delivered to his mother's home in Pelham, New York at a designated time.

75.     UPS did not deliver the package on time, and when his mother finally had to leave, she saw the UPS driver leaving and the package of medication left outside without a signature.

76.     More recently OptumRx delayed another shipment due on December 23, 2014 at 10am.

77.     His wife stayed home to wait for the delivery, and when it did not arrive by 11am, Mr. Doe called OptumRx and was informed that OptumRx would have to get back to him.

78.     Several more hours went by before OptumRx called and said there was a delay with UPS and he would not receive the shipment until the following day, Christmas Eve.

- 12 -

79.      That was a concern because Mr. Doe was down to a single dose, and he typically takes one dose per day over three consecutive days whenever he has a major bleed.

80.      He also takes a dose as a precaution if he knows he will be a long way from home without access to his medication or if he plans to have a particularly active day, such as when he plays with his child at the park.

81.      With the delay in the shipment and being down to one dose, Mr. Does was forced to preserve the last dose he had on hand.

82.      The next day, December 24th, the shipment had not arrived by noon, and OptumRxtold Mr. Doe to call UPS and handle it himself.

83.      The shipment finally arrived around 2pm, but by that time Mr. Doe had to change plans he had made in order to wait for the delivery.

84.      For all of these reasons, Mr. Doe's choice is to use BDRN as the pharmacy for his hemophilia medications and supplies.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Declaratory Judgment as to Section 3221(l)(18) of the New York Insurance Law)

85.      Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if set forth fully herein.

86.      By reason of the foregoing, an actual and justiciable controversy exists between Plaintiffs and United in that BDRN has been denied membership in United's specialty pharmacy network, and Mr. Doe has been denied his right to use the network pharmacy of his choice, on the basis of the imposition of terms and conditions that Plaintiffs allege to be inconsistent with Section 3221(l)(18) of the New York Insurance Law.

87.      Plaintiffs therefore seek a declaratory judgment  that:

HISCOCK & BARCLAY, LLP

HISCOCK & BARCLAY, LLP

a. the phrase "applicable terms and conditions" in Section 3221(l)(18) of the New York Insurance Law (i) means only those terms and conditions that are reasonably applicable to the network participating non-mail order retail pharmacy chosen by a health plan's member, and (ii) may not be construed to require URAC or other accreditation or certification not required by New York law, services with geographical coverage in the majority of the United States, or other term or condition not reasonably applicable to the network participating non-mail order retail pharmacy chosen by the health plan's member; and

b. having agreed in advance to the same reimbursement amount, as well as the same applicable terms and conditions, that United has established for its network participating mail order or other non-retail pharmacy, BDRN has fulfilled all of the conditions that United may impose under Section 3221(l)(18) of the New York Insurance Law as requirements for becoming participating providers in United's specialty pharmacy network.

## SECOND CAUSE OF ACTION
### (For Judgment Pursuant to 15 U.S.C. § 1 for Federal Antitrust Violations)

88.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if set forth fully herein.

89.     The relevant product market here is the market for the dispensing of the drugs contained in the formulary for United's specialty pharmacy network.

90.     Given state licensing requirements for retail pharmacies, the relevant geographical and demographic market for these products is the state of New York.

- 14 -

91.     Upon information and belief, many of the specialty drugs on United's formulary for its specialty pharmacy network are manufactured in states other than New York and/or in foreign nations and thus constitute a continuous and uninterrupted flow of interstate and foreign trade and commerce.

92.     The activities of United as described in this Complaint have been within the flow of, and have substantially affected, interstate trade and commerce.

93.     Upon information and belief, United maintains a sufficient market share to warrant antitrust scrutiny.

94.     Upon information and belief, United will only cover the costs of medications on its specialty drug formulary if a United member obtains such drugs from a pharmacy approved by United.

95.     Upon information and belief, United has not allowed any pharmacy other than its affiliate OptumRx entry into United's specialty pharmacy network, thus engaging in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, as amended (15 U.S.C. § 1).

96.     This unlawful combination and conspiracy may be renewed unless the relief prayed for herein is granted.

97.     The BDRN pharmacies, whose interests are aligned with their patients who are members of United's health plan, suffer an anti-trust injury, i.e., an adverse effect on competition in the market, by their exclusion from United's specialty pharmacy network.

98.     Plaintiff John Doe suffers an anti-trust injury in the form of decreased choice (in fact, a unitary choice) of a pharmacy for drugs that are essential to his health.

99.     The anti-competitive conduct of the Respondents is having an adverse effect on competition in the market for the dispensing of these drugs in that access to them is unduly restricted and at decreased

quality in terms of the timing and reliability of delivery and associated counseling from pharmacists.

100.     This anti-competitive conduct by United is causing injury to Plaintiffs as set forth above.

101.     Those injuries are direct, not remote, in that BDRN could dispense the drugs on United's specialty pharmacy formulary and could provide continued competition in the market for the dispensing of these drugs but for United's denial of BDRN's participation in that network.

102.     Similarly, Plaintiff John Doe could obtain his medications from the network pharmacy of his choice but for United's denial of BDRN's participation in that network.

103.     These injuries are not speculative.  United has been steering patients into mandatory mail order, resulting in increased stress, decreased choice, and in some instances missed or delayed treatments that compromise their health.

104.     The BDRN pharmacies have seen their patients cherry picked by OptumRx without the opportunity to compete on the merits of their service, expertise and loyalty to customers.  In short, the markets for these drugs are suffering anti-competitive damage.

105.     Because Plaintiffs seek only injunctive relief that would accrue to all United members in New York, there is no risk that others would be entitled to recover duplicative damages or that damages would be difficult to apportion.

### THIRD CAUSE OF ACTION
**(For Judgment Pursuant to Gen. Bus. Law § 340(1) for State Antitrust Violations)**

106.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if set forth fully herein.

107.     In addition to the relevant market, nature and effect of anti-competitive conduct, and the impact of the restraint of trade set forth in the Third Cause of Action above, the United's restriction of its to

specialty pharmacy network constitutes a reciprocal relationship among the Defendants.

108.    United steers prescription drug orders to its affiliate OptumRx to the benefit of United and OptumRx through increased profits to OptumRx and the United corporate family.

109.    Accordingly, United's steering of its members to its affiliated specialty pharmacy network constitutes an agreement, arrangement or combination whereby competition or the free exercise of the provision and consumption of pharmacy services in this state is restrained, and as such it violates Section 340(1) of New York's General Business Law.

## FOURTH CAUSE OF ACTION
### (Deceptive Business Practices and False Advertising Pursuant to General Business Law §§ 349 and 350)

110.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if set forth fully herein.

111.    Section 349 of the New York General Business Law makes it unlawful to engage in deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

112.    Section 350 of the New York General Business Law makes false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in New York State unlawful.

113.    Upon information and belief, United has made materially misleading statements in advertisements and marketing materials targeting current and potential members of United's network, which were released to the general public, and disseminated, communicated and marketed false and misleading information to mislead members about, and induce them not to exercise, their rights under AMMO to use the local pharmacy of their choice and which failed to inform the public that United would refuse to honor members' statutory rights to use the network pharmacy of their choice under AMMO.

114.    For example, United's website contains a pharmacy blog called Pharmacy InFocus, which

states, among other things, that "Members must use a network specialty pharmacy for benefit coverage of certain specialty medications in order to receive in-network benefits for their specialty medications." *See* http://www.uhcpharmacyinfocus.com/article/eliminating-grace-fills-for-specialty-drugs.

115.     United's misleading communications are transmitted to the public not only through its own website but via mail directly to patients.

116.     One representative communication is a letter dated January 30, 2014 that United sent to Mr. Doe and which states that "Per your health plan self-administered medications are covered through the prescription drug benefit and obtained through the Specialty Designated Pharmacy program."

117.     The letter goes on to direct the patient to "call the number on the back of your I.D. card for assistance in locating a Specialty Designated Pharmacy."

118.     The letter does not contain any disclosure that patients such as Mr. Doe are entitled to obtain any covered prescription at a network participating non-mail order retail pharmacy pursuant to the AMMO law.

119.     Upon information and belief, OptumRx is the only pharmacy identified by United when a patient calls to request a Specialty Designated Pharmacy.

120.     As the result of United's actions, Plaintiffs are entitled to the recovery of attorneys' fees and the costs of this litigation, as provided for in General Business Law §349.

## FIFTH CAUSE OF ACTION
### (False Advertising Pursuant to the Lanham Act 15 U.S.C. § 1125)

121.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if set forth fully herein.

122.     BDRN is engaged in commerce within the control of Congress.

123.     As set forth above at Paragraphs 113 to 119 above, upon information and belief, United has made materially misleading statements in advertisements and marketing materials targeting current and potential members of United's network, which were released to the general public, and disseminated, communicated and marketed false and misleading information to mislead members about, and induce them not to exercise, their rights under AMMO to use the local pharmacy of their choice and which failed to inform the public that United would refuse to honor members' statutory rights to use the network pharmacy of their choice under AMMO.

124.     Theses acts and omissions misrepresent the nature, characteristics and qualities of United's services and commercial activities, are false and misleading descriptions and representations of fact and constitute unfair competition.

125.     As a direct and proximate result of these acts and omissions by United, BDRN has suffered injury to its commercial interests in its business reputation and sales.  Its reputation has been injured because its patient clients can no longer rely on BDRN to obtain their life-sustaining drugs from BDRN.  BDRN has lost sales as a result of United members' obtaining their medications from other pharmacies because of United's misleading communications.

126.     United, through its false and deceptive advertisements and marketing, has diverted sales from BDRN to OptumRx, which is a direct competitor of BDRN's.

127.     United thus is liable under 15 U.S.C. § 1125(a)(1)(B), the Lanham Act.

128.     Plaintiffs are also entitled to an injunction under 15 U.S.C. § 1116 to prevent Defendants' further violations of 15 U.S.C. § 1125(a).

### JURY DEMAND

129.     Plaintiffs demand a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants:

HISCOCK & BARCLAY, LLP

1.      Declaring that

      a.   the phrase "applicable terms and conditions" in Section 3216(i)(28) of the New York Insurance Law (i) means only those terms and conditions that are reasonably applicable to the network participating non-mail order retail pharmacy chosen by a health plan's member, and (ii) may not be construed to require URAC or other accreditation or certification not required by New York law, services with geographical coverage in the majority of the United States, or other term or condition not reasonably applicable to the network participating non-mail order retail pharmacy chosen by the health plan's member; and

      b.   having agreed in advance to the same reimbursement amount, as well as the same applicable terms and conditions, that United has established for its network participating mail order or other non-retail pharmacy, BDRN has fulfilled all of the conditions that United may impose under Section 3216(i)(28) of the New York Insurance Law as requirements for becoming participating providers in United's specialty pharmacy network;

2.      Declaring that the Defendants have combined and conspired to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act;

3.      Declaring that the Defendants have combined and conspired to restrain trade and commerce in New York in violation of Section 349(1) of New York's General Business Law;

4.      Declaring that the Defendants are liable under 15 U.S.C. § 1125(a)(1)(B), the Lanham Act;

5.      Enjoining and restraining the Defendants, their officers, directors, agents, employees, and successors and all other persons acting or claiming to act on their behalf from, in any manner, directly or

HISCOCK & BARCLAY, LLP

indirectly, continuing, maintaining, or renewing the alleged combination and conspiracy, or from engaging in any other combination, conspiracy, contract, agreement, understanding or concert of action having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.    Enjoining and restraining the Defendants, their officers, directors, agents, employees, and successors and all other persons acting or claiming to act on their behalf from transmitting communications to the public through their websites, via mail directly to patients, or otherwise, stating that the rights of United and OptumRx members to obtain pharmacy benefits is limited in a way inconsistent with Section 3221(l)(18) of the New York Insurance Law;

7.    Ordering Defendants to allow BDRN to participate in United's Specialty Pharmacy Network for Pharmacy Benefit;

8.    Awarding Plaintiffs the costs of this action and reasonable attorneys' fees; and

9.    Awarding Plaintiffs such other and further relief as this Court may deem proper.

**DATED:** May 18, 2015                              **HISCOCK & BARCLAY, LLP**

By: _____ /s *Joseph A. Murphy* _____
                              Linda J. Clark
                              Joseph A. Murphy

*Attorneys for Plaintiffs*
Office and Post Office Address
80 State Street
Albany, New York 12207-2830
Telephone: (518) 429-4200

HISCOCK & BARCLAY, LLP